Robert B. Sykes (#3180)
Rachel L. Sykes (#11778)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah  84111
Telephone (801) 533-0222
bob@sykesmcallisterlaw.com
rachel@sykesmcallisterlaw.com
*Attorneys for Plaintiffs*


# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## NORTHERN DIVISION

| | | |
|---|---|---|
| BMG, LLC, dba SUBWAY; DALLAS BUTTARS; and KRISTIN MYERS, | ) ) ) ) | **AMENDED COMPLAINT** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| LAYTON CITY, a municipal corporation, CLINT BOBROWSKI, a Layton City Police Department Public Information Officer; TRAVIS LYMAN, a Layton City Police Lieutenant; and John and Jane Does 1-10. | ) ) ) ) ) ) ) ) | Civil No. 1:17-cv-127-DB

Judge Dee Benson |
| Defendants. | ) ) | |

Plaintiffs BMG, LLC, dba Subway, Dallas Buttars, and Kristin Myers, through counsel, complain and allege in this Amended Complaint against Defendants as follows:

## PRELIMINARY STATEMENT

This is a civil rights action in which the Plaintiffs seek relief for Defendants' violations of their rights guaranteed by the United States Constitution, specifically the Fourteenth, Fourth, and Fifth Amendments.  These rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983 and § 1988, and by the laws and the Constitution of the State of Utah.  Plaintiffs seek compensatory and punitive damages; affirmative and equitable relief; an award of attorney's fees, costs, and interest; and other and further relief as this Court deems just and equitable.  This action also arises under the constitution, law, and statutes of the State of Utah.

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and federal law, particularly under the provisions of the Fourteenth, Fourth, and Fifth Amendments to the Constitution of the United States, and 42 U.S.C. §§ 1983, 1985, and 1988.

2.      This action seeks redress for violations of the civil rights laws of the United States, and jurisdiction is therefore invoked pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

3.      The claims made in this Amended Complaint, filed pursuant to Rule 15(a), Fed.R.Civ.P., occurred and arose in Davis County, State of Utah, in this District. Venue is therefore proper under 28 U.S.C. § 1391.

4.      This Court also has supplemental jurisdiction over claims of due process violations under Article I §7 of the Utah Constitution (deprivation of liberty or property without due process of law).

5.      Plaintiffs are seeking damages pursuant to the claims for relief specified below in amounts to be proved at trial.

6.      This Court therefore has jurisdiction for trial of the above captioned matter.

## PARTIES

7.      Plaintiff **BMG, LLC dba Subway** is a limited liability company, a franchisee of Subway Corporation, which serves the public as a sandwich restaurant in Layton City, Davis County, State of Utah.

8.      Plaintiff **Dallas Buttars** is an owner of BMG, LLC dba Subway. Buttars is a citizen of the United States of America and is a resident of Davis County, State of Utah.  Many friends, neighbors, and acquaintances knew that Buttars owned this particular Subway.

9.      Plaintiff **Kristin Myers** is an owner of BMG, LLC dba Subway; Myers is a citizen of the United States of America and is a resident of Weber County, State of Utah.  Many friends, neighbors, and acquaintances knew that Myers owned this particular Subway.

10.    Defendant **Layton City** ("Layton") is a municipal corporation located in Davis County.  The Layton Police Department (LPD) is a division of Layton City.  Layton City appoints the police chief of the LPD and makes some policy for the LPD.  **Bobrowski** and **Lyman** at all times were police officers in the police department of Layton City, and were acting according to directions, and official policies, procedures and/or practices promulgated by Layton City through their superiors in the LPD and through policies or practices of the Doe Defendants who are Layton officials, which included the policy to meet with the press and answer questions about criminal matters. The Doe Defendants are other or additional Layton City officials, employees, and/or policymakers, who knew about the facts alleged herein, and who directed or allowed false statements to be made to the press on behalf of Layton City.  This action is therefore brought against Layton City, Bobrowski and Lyman in their official capacities.

11.    Defendant **Clint Bobrowski** ("Bobrowski") is a Layton City police officer and, at the relevant time, served as LPD's Public Information Officer (PIO). He is presumed to be a citizen of the United States of America, and presumed to be a resident of Davis County, State of Utah.

12.    Defendant **Travis Lyman** ("Lyman") was, at the relevant times, an LPD lieutenant, and on August 9, 2016, served as a designated interviewee for the press on the events described in this Complaint.  He may have been serving that day as the

PIO.  He is presumed to be a citizen of the United States of America, and presumed to be a resident of Davis County, State of Utah.

13.     At the time the acts occurred upon which this Amended Complaint is based, Defendants **Bobrowski** and **Lyman** were acting both personally and in their official capacities as a Public Information Officer and/or a person designated by the LPD to be interviewed by the press about this incident.  They were both employed by Layton City through the LPD.  This action is therefore brought against **Bobrowski** and **Lyman** in both their individual and official capacities.  Their authority to act was derived from Utah State law, the official policies, practices and procedures of Layton City, and/or the commands and directives of their superiors.  All of their acts listed in the following paragraphs were performed under color of the laws, statutes, ordinances, regulations, policies, customs, and practices and usages of the State of Utah and Layton City.

## AMENDED FACTUAL ALLEGATIONS

14.     In the early afternoon of August 8, 2016, at about 12:18 pm, a Layton City police officer was on a lunch break and went through a drive-through line to get a Subway sandwich and a drink at Plaintiffs' Subway shop located at 1148 East Highway 193, Layton, Utah.

15.     The officer received a sandwich and a drink, alleged he took a sip of the lemonade, and claimed to immediately feel strange or ill.

16.     The officer drove back to the police department and allegedly related what happened to fellow officers, i.e., his belief that his drink had been adulterated with some kind of drug.

17.     According to the Layton Police Department, "fellow officers" reportedly tested the ill officer's remaining drink with a "screening test" involving an ion scanner and the NIC test, and the tests allegedly came back positive for methamphetamine and THC.

18.     These screening tests are only preliminary, cannot generally be used in court, and have a very high false positive rate for showing drugs when there are no drugs.

19.     A short time later, still on August 8, 2016, Plaintiffs were contacted by Layton PD and told that an employee of their Subway sandwich shop had poisoned a Layton City police officer by surreptitiously putting some illegal substance into the drink he had ordered.

20.     Plaintiffs did not believe this allegation, but they cooperated with police investigators and the Davis County Health Department in every way, including, but not limited to, (a) voluntarily permitting a thorough physical search of the premises; (b) providing samples of all drink liquids and materials; (c) allowing all employees to be interviewed on the scene by police officers; (d) allowing a drug-sniffing dog to sniff the

restaurant; (e) providing the surveillance video recorded during the time of the alleged "poisoning;" and (f) watching it with LPD officers.

21.    None of the six (6) activities listed above turned up any evidence of drugs in the restaurant.

22.    The alleged perpetrator (referred to as "TU" herein), age 18, was an employee of Plaintiffs' Subway and had prepared the alleged victim officer's drink.

23.    TU absolutely denied any impropriety or misconduct.

24.    Additionally, between about 1:30-3:00 pm, (a) TU was thoroughly searched; (b) TU was interviewed and steadfastly denied the drugging; (c) his personal work area was examined; (d) his car was thoroughly searched; and (e) his car was sniffed by a police dog at the scene.  No evidence of drugs of any kind was found.

25.    During that same period of time, 1:30-3:00 pm, the LPD (a) thoroughly searched the premises of the Subway; (b) had a dog-sniff performed twice at the Subway; (c) interrogated all employees working that day; (d) watched videos of TU's activities in filling the drink; and (e) had urine and blood tests administered to detect drugs.  Absolutely no evidence of drugs or drug poisoning was found.

26.    TU was arrested early in the afternoon of the same day – August 8, 2016 – for surreptitious administration of a substance, a third degree felony.

27.     In the early afternoon of August 8, a KSL TV reporter did a "beat check" with the Layton Police Department.  A beat check involves calling police PIOs and inquiring about possible stories that may interest the public.

28.     The LPD PIO on August 8 was Defendant Clint Bobrowski.

29.     The KSL reporter was told by PIO Bobrowski that Layton City "might have something" and that she should check back in a few minutes.  Bobrowski then got permission from Layton City to reveal the poisoning story to the press, even though poison in the drink had not been confirmed, and despite the facts set forth in ¶¶20-25 above.  So, Bobrowski called the reporter back and set up an interview on camera, to occur later that afternoon at approximately 5:00-6:00 pm at the subject Subway.

30.     Layton City, through PIO Bobrowski, therefore offered KSL a scoop alleging "poisoning" at the Subway, despite the total lack of evidence of poisoning, and before it had definitively tested the drink, i.e., before it knew whether any crime had been committed, and despite convincing evidence that no one had in fact been poisoned.

31.     Layton City and the LPD knew at the time the KSL interview was offered that there was no probable cause to believe TU had poisoned the officer's drink. The LPD and Bobrowski also knew at this time that there was considerable exculpatory information that TU was innocent and that there had been no poisoning at the Subway.

**32.** Pursuant to official policy and practice, the LPD directed its PIO to allow the interview with the KSL TV news reporter, knowing that whatever he said would be broadcast over the TV station with the largest circulation in Utah.

**33.** LPD personnel provided Sgt. Bobrowski with considerable false information about what happened with the drink, including information that was inaccurate, preliminary and/or unknown at the time.

**34.** By the time of the actual interview, Bobrowski knew or should have known the facts set forth in ¶¶ 20-25 above, all of which suggested to a reasonable officer that TU was innocent and that there had been no poisoning at the Subway.

**35.** Based on reasonable belief and inference, LPD personnel instructed Bobrowski, in sum and substance, what to tell the press about this alleged poisoning story, and to omit key facts known to LPD and Bobrowski by the time of the interview. *See* ¶¶ 20–25 above.

**36.** The information LPD and Sgt. Bobrowski provided to KSL was false and defamatory, and stated, suggested, and/or implied that Layton police had seen and confirmed that a Subway employee deliberately put "meth" or other drugs in the police officer's drink.

**37.** Sgt. Bobrowski allowed himself to be interviewed by KSL between approximately 5:00 and 6:00 p.m. directly behind the Layton Subway, such that this

particular Subway, owned by Plaintiffs, was clearly visible and identifiable by any of its customers who saw the TV broadcast.

38.    In the KSL interview, Sgt. Clint Bobrowski, as the official spokesperson and PIO of the Layton PD, stated:

a.    "Our business causes us, a lot of us, to eat out every single meal, so something like this is incredibly terrifying.  I don't use the word 'terrifying' lightly.  It's scary."

b.    "*The drink* [served by TU at the Subway in question] *tested positive for THC and methamphetamine.*"

c.    "We were able to view video surveillance of him [TU] pouring the drink.  For some odd reason the individual leaves the drink on the counter and walked away for an unknown reason for a short period of time, returns to the beverage that still had its cap off, and appeared to be leaning over the beverage for an unknown reason for an unusual amount of time."

d.    "*We can obviously assume it [the poisoning] was because he was a police officer* in a marked vehicle but we don't know for sure."  (Bracketed words and emphasis added.)

39.    The clear implication of these statements was that a Subway employee poisoned the officer's drink with harmful, illegal drugs.

40.     These implications were false and defamatory toward Subway and the Plaintiffs.

41.     Layton and Bobrowski intentionally failed to disclose to KSL or the public that the ion and NIC screening tests were just preliminary screening devices, not generally admissible as proof in court, and that they both had a known high false positive rate.  In other words, the tests would often show the presence of a controlled substance when there was no illegal drug in the test sample.

42.     Additionally, Layton and Bobrowski failed to disclose the following facts that were known to Layton and Bobrowski at the time of the KSL interview, or shortly thereafter:

a.     **Thorough Search of Premises**.  The Subway had voluntarily permitted a thorough physical search of the premises by police officers sometime in the early afternoon, between approximately 2:30 and 3:30 p.m. on the day of the alleged incident.

b.     **TU Personally Searched**.  TU had been thoroughly searched personally, and no evidence of drug use or the presence of drugs were found on his person.

c.     **TU Personal Work Area Searched**.  The police had searched the personal work area of TU and had found no evidence of illegal drugs.

   **d.**  __Employees Interviewed at the Scene__.  The Subway had allowed all employees present at the time to be interviewed on the scene by police officers, with no evidence being found of drug use or other impropriety by TU or others.

   **e.**  __Drug-Sniffing Dog Search__.  The Subway had allowed a drug-sniffing dog to sniff the premises, without finding any indication of the presence of drugs anywhere in the restaurant.

   **f.**  __Officers Watched Video at the Scene__.  Plaintiffs had provided the surveillance video of activities inside the restaurant at the time of the alleged poisoning; officers had watched the video and had seen no evidence of poisoning.

   **g.**  __TU Car Searched and Sniffed__.  The car belonging to TU, parked in the parking lot of the Subway, was searched and dog-sniffed thoroughly at the scene, and no evidence of drugs of any kind was found therein.

   **h.**  __TU Steadfast Denial__.  TU was arrested and taken to the Layton Police Department, where he was interrogated by two detectives.  Throughout the day and several hours of interviews, TU consistently and steadfastly denied any possession or use of drugs and any poisoning of the officer.

   **i.**  __High False Positives on LPD Screening Tests__.  The ion and NIC chemical screening tests, which the LPD initially claimed showed the presence of THC (marijuana) and meth in the drink served to the officer, are only preliminary

screening devices.  Their results are generally not admissible in court and are known to show a high rate of false positives.

> **j.**    **5:00 p.m. Urine Test Negative**.  At approximately 5:00 p.m. in the early evening hours of August 8, 2016, the officer claiming to have been poisoned was taken to a local hospital for urine testing, searching for the presence of any illegal drugs in his system.  None were found.

> **k.**    **9:00 p.m. Urine Test Negative**.  At 9:00 p.m. on the same day, the officer was given a second urine test, which was likewise negative for the presence of any drugs.

43.    Additionally, based on reasonable knowledge and belief, and co-counsel Randy Richards' years of experience in criminal law, it is highly likely that the LPD had knowledge of negative results on the chemical and urine tests by the time the KSL interview was done.

44.    Based on information gathered from Bobrowski and other LPD employees or officials, and pursuant to Layton's official policy, procedure and practice to have its PIO meet with the press, Nicole Vowell, a KSL-TV reporter, broadcast the following statements about the incident in question on the 10:00 o'clock news on the evening of August 8, 2016 (broadcast at 11:00 p.m. that day due to the Olympics):

> **a.**    "What caused those side effects, police say, turned out to be a double dose of illegal narcotics inside his cup."

b. "According to investigators, *this 18-year-old Subway employee* [photo of TU] *is the one who slipped him the drugs.*"  (Emphasis added.)

c. "A horrifying set of circumstances, Sgt. Bobrowski says, for all officers who put on a uniform each day not knowing if they too could become a lunch-time target."

45. On August 8, on two occasions at approximately 5:00 p.m. and 9:00 p.m., the officer who consumed the soda at the subject Subway was tested at a local medical facility and was found to have no impairing drugs (THC, meth, etc.) in his system.

46. Thus, by the time KSL ran the defamatory story about the alleged poisoning on the August 8, 2016, 11:00 p.m. news, the conclusive facts demonstrating the innocence of TU and the Subway (nine key facts plus 2 urine tests described in ¶42 above) were known to Layton and Bobrowski.

47. KSL was unaware of the falsity or probable falsity of any of the facts or events set forth in ¶¶ 20-25 and 42 above.  It would not have run the story on the 11:00 p.m. news on August 8 if it had known **any** of these facts.

48. Despite the exculpatory findings and urine tests demonstrating the tragic error, neither Layton City, the LPD, nor Sgt. Bobrowski, made any attempt to notify KSL or Reporter Vowell prior to the 11:00 p.m. newscast on August 8 that the officer had **not been poisoned** by Subway's employee, TU.

49.     On August 9, 2016, in the early morning hours, Plaintiff Kristin Myers and Subway Field Consultants Valerie Firth and Brennon Trolley met at the Subway and watched the relevant video of the officer's drink being prepared.  They determined that they could observe all aspects of the transaction, and that *at no time* did TU put any substance into the officer's drink.

50.     On August 9, 2016, at about 12:30 p.m., LPD Detective Rushton called and requested that Plaintiffs bring to the station all the video camera tapes from the day of the incident.

51.     Plaintiffs reviewed the videos, frame by frame, with Detective Rushton.

52.     At the conclusion of the viewing, Detective Rushton indicated to Plaintiffs that the alleged victim police officer had taken two separate tests for drugs in a hospital, at 5:00 p.m. and at 9:00 p.m. on August 8, the day of the incident.  Detective Rushton informed Plaintiffs that the officer had tested *negative for any drugs* on both tests.

53.     After viewing the video with Plaintiffs on August 9, at about 12:30 pm, LPD's Detective Rushton indicated to Plaintiffs that he did not think TU did anything wrong, that he could not see any foreign substance being put into the officer's drink, that there was insufficient evidence to charge TU, and that TU would most likely <u>not</u> be charged with any crime.

54.    Detective Rushton also informed Plaintiffs that he had called the jail to get TU released, but his parents had already posted bail.

55.    TU was actually not charged with felony poisoning, or any other crime, on August 8 or 9, 2016, nor at any time thereafter.

56.    Despite that meeting and the admission of Det. Rushton, neither Layton City nor the LPD took any steps to correct the falsehoods published about the Subway and, by implication, its owners.  No effort was made, for example, to contact KSL and provide this new and important exculpatory information.

57.    After the KSL TV news story about the alleged poisoning ran at approximately 11:00 pm on August 8, 2016, other news organizations became interested in the story and contacted the LPD, requesting an interview.

58.    On the afternoon of August 9, 2016, the LPD provided Lyman, a Lieutenant in the Layton Police Department, for interviews with other news media, including Channel 2 KUTV News, Channel 4 ABC News, and Channel 13 Fox News.

59.    During these interviews, Lt. Lyman stated or implied, among other things, that the Layton Subway employee TU had in fact poisoned the LPD officer with illegal drugs, but that the officer had survived.  Lyman also stated that TU had been charged with a second degree felony and was in custody.

60.    Substantially all of the statements made by Lyman to Channels 2, 4 and 13 on the afternoon of August 9 were false and defamatory with respect to the

Layton Subway.  There had, in fact, been no poisoning, the poison in the drink had not been confirmed by admissible and reliable tests, TU had <u>not</u> been charged, and he was not in custody, among other falsehoods.

61.    Additionally, Lyman failed to disclose any of the facts set forth in ¶¶ 20-25 and 42 above.

62.    Many friends, acquaintances, and customers of the Subway and its owners knew that Plaintiffs Buttars and Myers were the owners and operators of this Subway.

63.    Their opinions of Buttars and Myers were diminished and damaged because these friends, acquaintances, and customers thought that Buttars and Myers ran a shoddy operation that hired people who would poison the drink of a police officer.

64.    For several days on and after August 8, 2016, the local news media continued to report falsely that a police officer was deliberately poisoned with drugs at Plaintiffs' Subway shop.

65.    For several days after the August 8 and August 9 events described above, multiple news agencies from all over the state were onsite during Subway's lunch rush to broadcast live about the "poisoning," the falsity of which Layton City had failed to correct despite having had multiple reasons and opportunities to do so.

66.    The false story of this alleged poisoning of the officer was also reported nationally and internationally by news organizations.

67.     On August 24, 2016, Plaintiff Buttars spoke with Assistant Layton City Attorney Steven Garside and asked why Layton City had not yet issued a statement indicating that the blood test results on the police officer were negative, and the in-store video showed no drug or other substance had been placed in the officer's drink.

68.     Garside reported to Buttars on that date that he was "waiting for the state crime lab," and Garside said the results of the testing on the drink would probably be another week.

69.     Plaintiffs intend to show that, in reality, the State Crime Lab can "turn around" or provide law enforcement with almost immediate results of most tests, including tests on the lemonade drink in question.  Based upon reasonable knowledge, information and belief, Plaintiffs allege that Defendants had the results of the tests from the State Crime Lab within a day or two of when they were submitted.

70.     On September 6, 2016, in response to questions similar to those in ¶67 above, Buttars was informed that the investigation was still ongoing.

71.     On September 23, 2016, Buttars and Myers attended a meeting with the Mayor of Layton City, the City Manager, and the LPD Chief of Police.

72.     At the above-referenced meeting, Buttars expressed grief at the "ongoing investigation" since the LPD and Layton City knew that all evidence gathered to that point had been exculpatory, indicating that no criminal act or misconduct had occurred at the Subway.

## DAMAGES AND ADDITIONAL HARM BY THE LPD

73.     Within a day of the KSL news story, Plaintiffs experienced a precipitous 30% drop in sales at the Subway.  These reduced sales continued for weeks.

74.     On August 9, the LPD came to the Subway and demanded that three Subway employees, all on the same shift as TU on August 8, come into the police station for interrogation.  Those employees were terrified, as they were grilled and cross-examined about the alleged poisoning of a police officer, what they knew about it, their own personal habits and views, and whether or not they participated in the poisoning.

75.     Other employees later learned of the grilling of the three employees.

76.     Shortly after this questioning, two (2) of the three (3) employees quit working at the subject Subway.  Later, four (4) more employees quit, all because of police interrogations.

77.     During the days after the incident, at least one Subway employee was confronted in the parking lot and harassed and questioned about his activities and lifestyle by an LPD detective.

78.     Within a few weeks after the incident, a valued, competent manager of the Subway shop quit because of the stress she was receiving from the police, continuing media reports, and unpleasant comments from the public.

79.     It is very expensive for a Subway store to train new employees and new managers.  Each "sandwich artist" undergoes 40 hours of training before they are allowed to work independently in a Subway store.

80.     Plaintiffs' Subway was forced to shoulder the expense of training many new employees due to the consequences of Defendant's actions.

81.     The manager quit just before the Labor Day 2016 holiday weekend, and this required Plaintiff Kristin Myers to cancel her own vacation and work the shifts that the manager otherwise would have worked.

82.     The KSL news story had a comment page that allowed viewers of the story to record their comments.  Before it was taken down, the comment page had 205 comments, almost all of which were overwhelmingly negative toward this Subway shop.

83.     This Subway shop lost several long-standing, valuable customers because of the false story published as a result of the LPD's actions.  For example, one private school had regularly, for several years, ordered sandwiches from the Subway for its school lunch program.  It quit ordering immediately after the news reports mentioned herein, and it has not ordered anything since.

84.     In October 2016, the State Crime Lab results were finally made available.  The determination was that no THC or methamphetamine was found in the drink.  On October 11, 2016, the LPD informed Plaintiffs of the results.

85.     It took the Subway shop several months to recoup its former sales, resulting in the loss of $17,000 in revenue.  In addition, Plaintiffs sustained additional losses as follows:  loss of food costs of $500; the cost to train new employees of $4,300; franchisee costs of $20,000; and a drug stigmatization loss of at least $250,000.

86.     Plaintiffs Buttars and Myers have also sustained significant mental and emotion stress and suffering as a result of Defendants' actions, in an amount to be determined at trial.

87.     These events were incredibly stressful for Plaintiffs.  Dallas Buttars consulted a physician for anxiety as a result.

88.     Plaintiffs discussed this matter with the Subway Corporation "incident team" in Orlando, Florida.  The team reported that there were 300,000,000 social media hits on this incident.

## FIRST CAUSE OF ACTION

### ~ Against Layton City in Its Official Capacity ~

**For Violations of the Fourteenth, Fourth, and/or Fifth Amendments
to the Constitution of the United States
Cognizable Under 42 U.S.C. § 1983**

89.     The allegations contained in all above paragraphs are incorporated herein by reference.

90.     "Section 1983 does, however, protect against the deprivation of a property interest 'whenever the State seeks to remove or significantly alter' the status

of liberty or property interests recognized by state law." *San Jacinto Sav.* & *Loan v. Kacal,* 928 F.2d 697, 701 (5th Cir. 1991).

91.     False assertions that drug traffic took place on Plaintiffs' premises deprived Plaintiffs of the right to have property and enjoy the benefits of it, as well as to have the liberty to operate it as a legitimate business.

92.     Defamatory actions of a police official at press conferences can be the basis of a constitutional slander case, where there is otherwise independent harm resulting from the event.  *Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir. 1992).

93.      To prevail on this claim, Plaintiffs "must allege and establish that there was information published that was false and stigmatizing."  *Whitney v. State of N.M.,* 113 F.3d 1170, 1175 (10 Cir. 1997).  Fact No. 38, among others, establishes this element.

94.     The stigmatization must also be coupled with the loss of a liberty or property interest "initially recognized and protected by state law." *Id.* (citing, *Paul v. Davis*, 424 U.S. 693, 710 (1976); *see Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 982 (10th Cir.1991)).

95.     In order to prevail on a constitutional slander claim, the plaintiff must show an independent harm to satisfy the "plus" part of the "stigma plus" test.

96.     The independent harm suffered by Plaintiffs in this case includes as least the following:

        a.      ***Immediate loss of revenue*** of approximately 30%, beginning the day after the news stories began to run, and lasting at least 5 months.

        b.      ***Police harassment and accosting*** of the Subway's employees, beginning the day of the alleged poisoning and continuing over the next several days when employees were subjected to accusatory and hostile police interrogations, accosted in the parking lot, and/or ordered to report to the police station and be grilled in an accusatory manner regarding this event and their alleged possible participation therein.

        c.      ***Failure of Defendants to announce publicly and promptly*** that: (i) two urine tests had been done the night of the alleged event, and both were negative for any alleged poisoning, (ii) the restaurant, including TU's workspace, had been thoroughly searched, with no drugs being found; (iii) a dog sniff had occurred at the restaurant, with no "hits" for drugs; (iv) TU personally, and TU's car, had been searched and dog-sniffed, and no drugs had been found; (v) all other employees had been interviewed, without turning up any evidence of drug use by TU or anyone else; and (vi) LPD detectives had watched the video of TU filling the drink on the day of the incident and again the next day, and saw no evidence that he put anything in the soda cup other than soda.  Such a prompt announcement would have significantly limited the damages sustained by Plaintiffs.  *See* ¶¶ 20-25, 42 above.

        d.      ***A long delay in announcing*** that the Subway and its employees were innocent of any poisoning, even after Defendants knew on the evening of August

8, at 5:00 p.m. and 9:00 p.m., that there had been no poisoning.  This delay continued to cause harm to Plaintiffs.

97.     Plaintiffs were clearly defamed (Fact No. 38) when Layton City and Bobrowski alleged, stated, and/or implied that the Subway's employee had poisoned an LPD officer with illegal drugs.

98.     "Where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, a protectable liberty interest may be implicated that requires procedural due process in the form of a ***hearing*** to clear his name." *Martin Marietta Materials, Inc. v. Kansas Dept. of Trans.*, 810 F.3d 1161 (10th Cir. 2016) (emphasis added), citing *Gwinn v. Awmiller,* 354 F.3d 1211, 12 16 (10th Cir. 2004) (other citations and punctuation omitted).  This "hearing" is essential.  *Board of Regents v. Roth,* 408 U.S. 564, 573 (1972) (citations omitted); *see also, Goss v. Lopez,* 419 U.S. 565, 574 (1975).

99.     "The liberty interest that due process protects includes the individual's freedom to earn a living." *Setliff v. Memorial Hosp. of Sheridan County,* 850 F.2d 1384, 1396 (10th  Cir. 1988) (citation omitted).

100.     "Moreover it is necessary that the alleged stigmatization be entangled with some further interest.... For example, plaintiffs must allege and present evidence of ***present harm to established business relationships.***" *Jensen v. Redevelopment Agency of Sandy City,* 998 F.2d 1550, 1558 (10th Cir. 1993) (punctuation and citations

omitted; emphasis added).   Plaintiffs sustained harm to their present business relationships, as set forth above.  *See* Fact No. 73, among others.

101.   Layton City's actions, as implemented by the Layton City Police Department and its Public Information Officers and spokespersons, have significantly altered Plaintiffs' liberty interests by interfering with Plaintiffs' rights to successfully operate their previously successful business, and to continue to make a fair profit unfettered by the defamatory publication by Defendants.  This defamation, together with harassment of employees, has directly resulted in a significant "harm to present business relationships," including loss of customers, loss of profit, loss of employees due to harassment, and loss of employment opportunity.  In other words, Layton not only defamed and "stigmatized" Plaintiffs, but added a "plus" that foreclosed and damaged Plaintiffs' freedom to take profitable advantage of their business enterprise or other employment opportunities with businesses that needed catering.  *See Corbitt v. Andersen,* 778 F.2d 1471, 1474-5 (10th Cir. 1985) ("Under Corbitt's theory of the case, we are dealing with something more than a damaged reputation.  The right to pursue one's chosen profession unfettered by state action which does not comport with the 14th Amendment, is referred to in *Schware v. Board of Bar Examiners*, 353 U.S. 232 ... (1957)."

102.   Layton's communications, issued by Defendants Bobrowski and Lyman, and possibly others, represent the antithesis of due process, which requires some form of hearing when an individual is to be deprived of a liberty or property interest by government action. Here, Plaintiffs received no due process before Layton provided false

and defaming information to the news media for general and wide-spread dissemination. *See id.*

103.    Defendants' actions herein were intentional and/or reckless, entitling Plaintiffs to punitive damages, such as may be allowed by law.

104.    The Court should order and enjoin Defendants to issue a public apology, stating that absolutely no wrong had been committed by either TU or the Subway.

105.    Plaintiffs are entitled to attorney fees under § 1988.

## SECOND CAUSE OF ACTION

### ~ Against Bobrowski and Lyman in Their Individual Capacities ~

**For Violations of the Fourteenth, Fourth, and/or Fifth Amendments
to the Constitution of the United States
Cognizable Under 42 U.S.C. § 1983**

106.    The allegations contained in all above paragraphs are incorporated herein by reference.

107.    Plaintiffs had a constitutional right not to be defamed by Layton's PIOs, Sgt. Bobrowski and Lt. Lyman.

108.    A reasonable officer in the positions of Bobrowski and Lyman would have known that Plaintiffs had such a right.

109.   The right not to be defamed by government action or by a PIO or spokesperson such as Bobrowski and Lyman is clearly established in the Tenth Circuit, as set forth in the cases cited above in the First Cause of Action.

110.   Defendant's actions herein were intentional and/or reckless, entitling Plaintiffs to punitive damages, such as may be allowed by law.

111.   The Court should order Bobrowski and Lyman to issue a public apology, stating that absolutely no wrong had been committed by either TU or the Subway.

112.   Plaintiffs have been damaged as set forth in the First Cause of Action, which damages are incorporated herein by reference.

113.   Plaintiffs are entitled to attorney fees under § 1988.

<u>THIRD CAUSE OF ACTION</u>

~ <u>Against All Defendants</u> ~

<u>For Outrageous Conduct That Shocks the Conscience</u>
**and Violates the Fourteenth Amendment
to the Constitution of the United States
Cognizable Under 42 U.S.C. § 1983**

114.    The allegations contained in all above paragraphs are incorporated herein by reference.

115.   <u>**Prior**</u> to the highly defamatory story running on the KSL 11:00 p.m. news on August 8, 2016, Layton City, the LPD, and Sgt. Bobrowski, acting for Layton

City, the LPD, and for himself, knew at least the following facts that conclusively proved the innocence of TU and the Subway restaurant:

         **a.**    **<u>Thorough Restaurant Search</u>**.  The Subway had voluntarily permitted a thorough physical or manual search of the premises by police officers sometime in the early afternoon, between approximately 2:30 p.m. and 3:30 p.m.

         **b.**    **<u>Thorough Personal Search</u>**.  TU had been thoroughly searched, and no evidence of drug use or the presence of drugs were found on his person.

         **c.**    **<u>Employees Interviewed</u>**.  The Subway had allowed all employees to be interviewed on the scene by police officers, with no evidence being found of drug use or other impropriety by TU or others.

         **d.**    **<u>TU's Personal Work Area</u>**.  The Subway allowed police to thoroughly search the entire restaurant and TU's personal work area, with no evidence found of the presence of illegal drugs.

         **e.**    **<u>Dog Sniff</u>**.  The Subway and TU had allowed a drug-sniffing dog to sniff the premises, without finding any indication of the presence of drugs anywhere in the restaurant or car.

         **f.**    **<u>TU's Car</u>**.  The car belonging to TU, parked in the parking lot of the Subway, was searched and dog-sniffed at the scene, and no evidence of drugs of any kind were found therein.

g.      **Surveillance Video**.  Plaintiffs had provided the surveillance video of activities in the restaurant at the time of the alleged poisoning; officers had watched the video, and had seen no evidence of poisoning.

h.      **TU's Steadfast Denial**.  TU was arrested and taken to the Layton Police Department, where he was interrogated by two detectives.   He consistently and steadfastly denied any possession or use of drugs and any poisoning of the officer.

i.      **5:00 P.M. Urine Test**.  At approximately 5:00 p.m. on August 8, 2016, the officer claiming to have been poisoned was taken to a local hospital for urine testing, searching for the presence of any illegal drugs in his system.  The urine test was negative.

j.      **9:00 P.M. Urine Test**.  At 9:00 p.m. on the same day, the officer was given a second urine test, which was likewise negative for the presence of any drugs in his blood system.

k.      **Ion and NIC Screening and False Positives**.  The ion and NIC chemical screening tests, which the LPD initially claimed showed the presence of THC (marijuana) and meth in the drink served to the officer are only preliminary screening devices.  The results are generally not admissible in court.  They are known to show a high rate of false positives.

116.   None of the information set forth above was disclosed to KSL prior to the 11:00 p.m. news, despite the fact that there was plenty of time to do so.

117.   Had this information been disclosed to KSL or Nicole Vowell, the reporter, the story would not have run on the news that night, or would have been vastly different and not defamatory.

118.   Likewise, prior to doing the TV interviews on August 9, 2016, Lt. Lyman, acting for Layton City, the LPD, and for himself, knew all the facts in ¶115. Lyman knew as well that TU had been released without being charged, and knew that he had not poisoned the officer.

119.   Had the above information been disclosed to the reporters doing the stories on August 9, 2016, those stories also would not have run, or would have been vastly different and not defamatory.

120.   On both dates, but particularly on August 9, 2016, LPD officers blatantly lied about known facts, and/or concealed important information that they knew.  The effect of this outrageous and conscience shocking conduct was to defame the Subway.

121.   Additionally, based on reasonable inferences and belief, other John and Jane Doe officials and employees of Layton City, acting for the city, knew the facts set forth in this Third Cause of Action.  These Doe officials allowed and sanctioned the

practices, procedures and actions, such that they became the official actions of Layton City.

122.   The actions of Defendants, including the Doe officials, are outrageous and conscience shocking. Defendants allowed the stories of the poisoning to go forward on the news, despite knowing or having considerable evidence that the stories were false, and knowing that it would severely harm not only TU but the Layton Subway store.  The actions of these and the Doe Defendants that night and the next day, August 8 and 9, 2016, as set forth herein, constituted a substantive due process violation of the Fourteenth Amendment in that Defendants' actions "demonstrate[d] a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995).

123.   To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or "employ[ed] it as an instrument of oppression."  *Williams v. Berney,* 519 F.3d 1216, 1220 (10th Cir. 2008) (internal punctuation omitted).

124.   The Tenth Circuit has held that "[o]utrageous government conduct during a criminal investigation may constitute a violation of substantive due process rights."  *Romero v. United States,* 658 Fed.Appx. 376 (10th Cir. 2016) (citing *United States v. Mosley,* 965 F.2d 906, 908–09 (10th Cir. 1992) (internal punctuation omitted).  Such outrageous conduct occurred in this criminal investigation of TU and the Subway.

125.   The actions of Defendants and the Does herein were intentional and/or reckless, entitling Plaintiffs to punitive damages, such as may be allowed by law.

126.   The Court should order and enjoin Defendants to issue a public apology, stating that absolutely no wrong had been committed by either TU or the Subway.

127.   Plaintiffs have been damaged as set forth above.

128.   Plaintiffs are entitled to attorney fees under § 1988.

### FOURTH CAUSE OF ACTION

### ~ Against Layton City In Its Official Capacity ~

### Failure to Train and/or Supervise & Defective Policy or Practice
### Cognizable Under 42 U.S.C. § 1983

129.   Plaintiffs incorporate by reference all above allegations.

130.   On August 8 and 9, 2016, as described above, Layton City, through the LPD and its PIO and/or spokespersons, Sgt. Bobrowski and Lt. Lyman, and through the Doe Defendants, perpetrated an outrageous and unjustified slander against Plaintiffs. This slander deprived Plaintiffs of their procedural and substantive constitutional rights, as alleged and described herein, which descriptions are incorporated here by reference.

131.   It was a common, foreseeable, and usual practice that Layton City would interact with the press, including TV stations like KSL, KUTV, ABC4 and FOX13, for the purpose of explaining police matters.

132.   In fact, Layton City and the LPD had an official policy or practice to talk with the press about police matters, and a PIO or other spokesperson was employed for this very purpose.  Said spokespersons would interface with members of the press frequently.

133.   Layton City and the LPD had a duty to fully and adequately train and supervise its PIO and spokespersons to follow its policies, procedures, and/or protocols, if they existed, to be truthful to the press, and to not omit facts and truthful information in its press interactions.

134.   Part of Layton City's practice, through the LPD, was to allow its spokespersons to comment on developing police stories before all the facts were known. This defective practice created a risk of defaming innocent people and businesses with false and defamatory allegations of criminal conduct, before all the facts were known, and before innocence was obvious.

135.   Layton City and the LPD had the duty and responsibility to train and supervise its officers abide by the U.S. Constitution and to protect its citizens, including Plaintiffs, from unnecessary, serious, and foreseeable harm associated with the publication and release of false and defamatory information about possible criminal conduct, particularly before all the facts were known.

136.   Layton City had all these duties in order to avoid the substantial risk and possibility of defaming innocent citizens with false charges of criminal conduct, which would cause serious, irreversible damage to innocent citizens.

137.   Layton City and its LPD knowingly and recklessly failed to adequately train and/or supervise its PIOs and spokespersons and enforce its policies, procedures, practices and/or protocols, if they existed, regarding the use and release of false information to the press relating to crimes or before having all the facts, in order to avoid the risk of constitutional defamation.

138.   Layton City's and the LPD's failure to utilize and enforce its policies, procedures, practices and/or protocols, if they existed, and to train and supervise its officers in the lawful utilization of those policies, procedures, practices and/or protocols, if they existed, demonstrated a reckless indifference to the rights, safety, well-being, and lives of residents of Utah who might live or work in and around Layton City, and in particular, the Plaintiffs.

139.   Layton City's and the LPD's failure to fully and adequately train and supervise its officers, and to enforce its policies, procedures, and/or protocols, if they existed, proximately caused Plaintiffs' defamation, in that the lack of training, supervision, establishment of constitutional procedures and practices, and/or education in the lawful publication of facts about alleged criminal conduct, such as the alleged

poisoning in this case, proximally caused Plaintiffs to be needlessly defamed, which led to the serious damages alleged herein.

140.   The actions, or inactions, of Layton City, as described above, constitute willful, wanton, and heedless disregard for the rights, well-being, reputation, and safety of Utah citizens, including Plaintiffs, and warrant the imposition of punitive damages such as may be allowed by law.

141.   The conduct described herein reflects a practice or custom informally and customarily condoned by Layton City, which practice or custom consists of allowing or instructing its PIOs or spokespersons to appear for press interviews, either without having all the true facts, without checking the true facts, and/or with the intent to falsify or provide a false impression by omitting key facts necessary for the truth to be known. The effect of this was to expose innocent citizens, like Plaintiffs, to defamation such as occurred in this case.

142.   Layton City was knowingly and deliberately indifferent toward the proper training and supervision of its officers and its PIOs, particularly in the appropriate dissemination to the press of facts about possible crimes, based on incomplete, false, and/or unknown information, or information that was stale, outdated, or not fact-checked.  The effect of this was to expose innocent citizens to defamation such as occurred in this case.

143.   Plaintiff demands judgment against Defendants for compensatory damages, for punitive damages, for costs and attorney fees, and for such other relief as is available under law and as this Court deems just and proper.

## FIFTH CAUSE OF ACTION

### ~ Against All Defendants ~

### For Violation of State Civil Rights
### Brought Pursuant to the Court's Supplemental Jurisdiction
### Under 28 U.S.C.A. 1367(a)

144.   The allegations contained in all above paragraphs are incorporated herein by reference.

145.   The Utah Constitution provides as follows:

Sec. 7. [Due process of law.]  No person shall be deprived of life, liberty or property, without due process of law.

Constitution of the State of Utah, Article I, Section 7.

146.   Article I, Section 25 states in relevant part: "This enumeration of rights shall not be construed to impair or deny others retained by the people."  Among other "retained" rights, Plaintiffs had the right not to have Layton City and its PIO slander them on statewide TV under the circumstances described herein.

147.   The notice provision of the Utah Governmental Immunity Act, as delineated in Utah Code Ann. §630-7-401(2), does not apply to Plaintiffs' State Constitutional claims because such claims are self executing.  A Utah State constitutional provision is self executing:

> ... if it articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers.  In other words, courts may give effect to a provision without implementing legislation if the framers intended the provision to have immediate effect and if "no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed ..."

*Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.,* 2000 UT 87, 16 P.3d 533, 535.

148.   These violations of Plaintiffs' rights by Defendants are guaranteed by the Utah Constitution and other statutes and laws, and such violations entitle them to compensatory and punitive damages, injunctive relief, statutory civil penalties, and attorney's fees, all of which are requested and provided for by the laws and Constitution of Utah.

149.   A corporation is a "person" under Utah law.

150.   Defendants are individuals and entities who were acting under color of law throughout the duration of the events described herein.

151.   Defendants have deprived Plaintiffs of a property interest without due process of law, as set forth above.

152.   Defendants caused the publication of a false and defamatory claim that Plaintiffs' restaurant employee poisoned an officer's drink with THC and meth.

153.   Defendants conducted a news conference leveling these false allegations, and did so such that the Subway was clearly identified in the background.

154.   At the time these charges were aired on the news, Defendants knew that they were false or likely false, due to many exculpatory pieces of evidence.  Yet, Defendants took no actions to prevent the airing of these knowingly false charges.

155.   After the charges had been aired on the news on the evening of August 8, and later on August 9, Defendants took no prompt action to correct the falsehood by revealing the numerous pieces of evidence that proved or suggested that there had been no poisoning.

156.   Defendants' actions, as set forth herein, were a flagrant, egregious, outrageous, and conscience-shocking violation of Plaintiffs' Article I § 7 rights to procedural and substantive due process of law, and demonstrated a strong element of venality.  Defendants' actions further showed that they arbitrarily abused their authority and employed it as an instrument of oppression.

157.   Defendants' actions demonstrated a degree of flagrancy and outrageousness, and a magnitude of potential or actual harm, that was truly conscience shocking.

158.   There were no other existing remedies to redress Plaintiffs' injuries. Further, equitable relief such as an injunction was and is wholly inadequate to protect Plaintiffs' rights or redress their injuries.  The damage had already been done on the evening of August 8, 2016, and there was no remedy available after the false statements had been published.

159.   As a direct and proximate result of the aforementioned conduct of Defendants, and in addition to all damages set forth herein, Plaintiffs Buttars and Myers have suffered and will continue to suffer emotional and psychological distress and mental anguish, the exact nature and amount of which will be determined at trial.

160.   Defendants acted willfully and with a reckless disregard for Plaintiffs' rights.   Plaintiffs are therefore entitled to an award of punitive damages against Defendants for the purpose of punishing these Defendants and to deter them and others from such conduct in the future.

161.   Plaintiffs are entitled to attorney fees under the inherent authority doctrine, as well as any other provisions of Utah Law that may be found to apply in this case.

162.   The Court should order and enjoin Defendants to issue a public apology, stating that absolutely no wrong had been committed by either TU or the Subway.

### **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants and the Does as follows:

1.   For general compensatory damages in an amount to be determined at trial;

2.   For special damages, such as are shown at trial;

**3.**     For punitive damages against each Defendant, including the Does, as may be allowed by law;

**4.**     For an Order or Injunction directing Defendants to publish an apology to Plaintiffs and to TU for wrongly accusing them of a drug offense on August 8, 2016;

**5.**     For pre-judgment interest on the damages assessed by the verdict of the jury, as allowed by law;

**6.**     For Plaintiffs' costs and reasonable attorney fees incurred herein, pursuant to 42 U.S.C. § 1988 and/or pursuant to Utah law; and

**7.**     For such other and further relief as the Court deems just and proper.

DATED this 24th day of August, 2017.

SYKES MCALLISTER LAW OFFICES, PLLC

 */s/ Robert B. Sykes*                                   
ROBERT B. SYKES
RACHEL L. SYKES
*Attorneys for Plaintiffs*

Amended Complaint.wpd